**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| ODILON GARCIA, JONATHAN NEUMANN, and ZACHERY YOUNG, Individually and On Behalf of All Others Similarly Situated, | Case No. 1:24-cv-02090 |
| Plaintiffs, | Hon. Jeremy C. Daniel |
| v. | **JURY TRIAL DEMANDED** |
| DOMINO'S PIZZA FRANCHISING LLC and CONVERSENOW TECHNOLOGIES, INC. | |
| Defendants. | |

**AMENDED CLASS ACTION COMPLAINT**

Odilon Garcia, Jonathan Neumann, and Zachery Young ("Plaintiffs"), individually and on behalf of all others similarly situated, bring this Class Action Complaint for violations of the Illinois Biometric Information Privacy Act, 740 ILCS 14/1 *et seq.* ("BIPA"), against Domino's Pizza Franchising LLC ("DPF") and ConverseNow Technologies, Inc., ("ConverseNow"), and allege as follows based on personal knowledge as to themselves and on the investigation of counsel.

**NATURE OF THE ACTION**

1.      This lawsuit arises out of Defendants' actions in collecting, capturing, otherwise obtaining, using, and/or storing the biometric identifiers and/or biometric information, including the unique "voiceprints," of Plaintiffs and other similarly situated individuals, without informing them in writing or obtaining their written consent, as required by BIPA.

1

2. As the Illinois Legislature has recognized,

> [B]iometrics are unlike other unique identifiers that are used to access finances or other sensitive information. For example, even sensitive information such as Social Security numbers can be changed. Biometrics, however, are biologically unique to the individual; therefore, once compromised, the individual has no recourse, is at heightened risk for identity theft, and is likely to withdraw from biometric-facilitated transactions.

*Carpenter v. McDonald's Corp.*, 580 F.Supp 3d 512, 515 (N.D. Ill. 2022) (citing 740 ILCS 14/5); *see also Bryant v. Compass Grp. USA, Inc.*, 958 F.3d 617, 619 (7th Cir. 2020) (noting the "threat of irreparable privacy harms, identity theft, and other economic injuries" arising from biometric data).

3. In light of these privacy concerns, the growing use of biometrics in various contexts, and the fact that "[t]he full ramifications of biometric technology are not fully known," BIPA was enacted to regulate how private entities may collect, use, and/or store individuals' biometric identifiers, including voiceprints, and biometric information. 740 ILCS 14/5.

4. BIPA, provides, *inter alia*, that no private entity may collect, capture, or otherwise obtain biometric identifiers (including voiceprints) or biometric information without first informing the subject in writing of the fact, purpose, and length of the collection and receiving a written release from the subject. 740 ILCS 14/15(b). BIPA also prohibits private entities from profiting from the biometric identifiers or information. 740 ILCS 14/15(c). BIPA further requires that private entities in possession of biometric identifiers or biometric information must develop a publicly available written policy establishing a schedule for their retention and, importantly, their destruction, within certain statutory time limits. 740 ILCS 14/15(a).

5. Although BIPA was enacted in 2008, Defendants have been violating the statute

since at least 2020 by collecting, capturing, otherwise obtaining, using, and/or storing the unique and highly sensitive "voiceprints" of thousands of individuals in Illinois, without their knowledge or consent, through the use of artificial intelligence ("AI")-assisted voice technology for Domino's customers' telephone orders, developed by Defendant ConverseNow.

6.     Defendants do not appear to have publicly available retention or destruction schedules relating to biometric identifiers or biometric information, so it is likely that Defendants are retaining Plaintiffs and other Class members' biometric identifiers and/or biometric information beyond the time limits set by BIPA.

7.     Plaintiffs bring this action on behalf of all individuals who had their voiceprints, biometric identifiers, and/or biometric information collected, captured, otherwise obtained, used, and/or stored, when making a telephone order at a Domino's location in Illinois at any time within the applicable statute of limitations, to prevent Defendants from further violating Illinois law and to recover damages for Defendants' violations of their and other Class members' statutorily-protected rights to privacy under BIPA.

## **THE PARTIES**

8.     Plaintiff Odilon Garcia is, and has been at all relevant times, a resident and citizen of Chicago, Illinois. Over the course of the past five years, Mr. Garcia has called the Domino's location at 2337 West Cermak Road, Chicago, Illinois, dozens of times to place an order for food, and has interacted with AI-assisted voice technology during those calls.

9.     Plaintiff Jonathan Neumann is, and has been at all relevant times, a resident of Bartlett, Illinois. Between May and July 2023, Mr. Neumann called the Domino's location at 1234 S. Canal St., Chicago, Illinois, on at least two occasions to place an order for food, and has interacted with AI-assisted voice technology during those calls.

10.     Plaintiff Zachery Young is, and has been at all relevant times, a resident and

citizen of Quincy, Illinois. Over the course of the past six months, Mr. Young has called the Domino's location at 2501 S. Broadway Street, Quincy, Illinois, between five and ten times to place an order for food, and has interacted with AI-assisted voice technology during those calls.

11.    Defendant Domino's Pizza Franchising LLC ("DPF") franchises Domino's Pizza restaurants in Illinois and throughout the United States. DPF is a Delaware limited liability company that maintains its principal place of business in Michigan. DPF is an indirect, wholly-owned subsidiary of Domino's Pizza, Inc. ("Domino's"), which owns, operates, oversees, and controls the "Domino's" brand of pizza restaurants. Domino's is the largest pizza company in the world, with approximately $18 billion in global retail sales in 2023 – 49% of which were generated in the United States.[1] There are approximately 224 Domino's locations in Illinois.

12.    Defendant ConverseNow Technologies Inc. ("ConverseNow") is a private AI startup company founded in 2018, incorporated in Delaware, and headquartered in Texas. ConverseNow's patented voice AI technology is utilized at more than 1,800 stores in 46 states, including in Illinois.[2] ConverseNow "proudly operate[s] in more stores than any other restaurant voice AI company" and "processes[es] millions of live conversations each month."[3]

## JURISDICTION AND VENUE

13.    This court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. §1332(d) because there are more than 100 Class members, the aggregate amount in controversy exceeds $5,000,000, exclusive of interest, fees, and costs, and at least one Class member is a

---

[1]  Domino's 2023 Investor Day Presentation, *available at* https://ir.dominos.com/static-files/4d1438ce-a87a-46f0-a491-ed48244517ee.

[2]    https://conversenow.ai/company/;    https://hospitalitytech.com/news-briefs/2023-12-03?article=conversenows-voice-ai-assistants-redefine-restaurant-industry-outstanding-milestones-and-growth.

[3] https://conversenow.ai/technology/.

citizen of a state different from at least one Defendant.

14.     Venue is proper in this District pursuant to 28 U.S.C. §1391(b)(1) and (c)(2) because Defendants do business in and are subject to personal jurisdiction in this District. Venue is also proper in this District pursuant to 28 U.S.C. §1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.

## FACTUAL BACKGROUND

### I.     Illinois's Biometric Information Privacy Act

15.     Recognizing the "very serious need [for] protections for the citizens of Illinois when it [comes to their] biometric information," the Illinois Legislature enacted BIPA in 2008. Illinois House Transcript, 2008 Reg. Sess. No. 276. BIPA regulates, *inter alia*, "the collection, use, safeguarding, handling, storage, retention, and destruction of biometric identifiers and information." 740 ILCS 14/5(g).

16.     Under BIPA, a "biometric identifier" refers to a person's "retina or iris scan, fingerprint, **voiceprint**, or scan of hand or face geometry." 740 ILCS 14/10 (emphasis added). "In other words, a biometric identifier is a unique personal feature that can be used to identify a person." *McDonald's*, 580 F.Supp. 3d at 515. "Biometric information" refers to "any information, regardless of how it is captured, converted, stored, or shared, based on an individual's biometric identifier." 740 ILCS 14/10.

17.     While BIPA does not define "voiceprint," the dictionary defines it as a "distinctive pattern of curved lines and whorls made by a machine that measures human vocal sounds for the purpose of identifying an individual speaker." *McDonald's*, 580 F.Supp. 3d at 515 (citing "Voiceprint," BLACK'S LAW DICTIONARY (11th ed. 2019)).

18.     "The physical characteristics of one's voice and the manner of speaking are

unique to every person and are stable enough to be used for extremely reliable identification."[4] Further, "[b]ased on voice samples that became known (directly or indirectly) to belong to certain individuals . . . and that would be typically stored in a database, it is possible to identify those persons at any moment in the future on the basis of the person's voice, even if no other identifiers would be revealed."[5] As such, voice recognition and voice AI technology pose serious risks, "from violations of privacy to infringements on copyright law – with uses in criminal activity or fraudulent activity….[6]

19.     BIPA requires that before a private entity can collect, capture, or otherwise obtain an individual's biometrics, it must: (1) inform the person in writing that biometric identifiers or information will be collected or stored, (2) inform the person in writing of the specific purpose and length of term for which such biometrics are being collected, stored, and used, and (3) obtain a written release from the person or their legally authorized representative authorizing the collection or his or her biometrics. 740 ILCS 14/15(b). The informed-consent requirement has been described by the Seventh Circuit as the "heart of BIPA," because it ensures that "consumers understand, before providing their biometric data, how that information will be used, who will have access to it, and for how long it will be retained." *Bryant*, 958 F.3d at 626.

20.     In addition, "no private entity in possession of a biometric identifier or biometric information may sell, lease, trade, or otherwise profit from a person's or a customer's biometric

---

[4] Oleksandr Pastukhov and Els Kindt, "Voice Recognition: Risks to Our Privacy," *Forbes* (Oct. 6, 2016), *available at* https://www.forbes.com/sites/realspin/2016/10/06/voice-recognition-every-single-day-every-word-you-say/?sh=6a3ce1af786d.

[5] *Id.* Indeed, "[f]orensic scientists may soon be able to glean more information from a mere recording of a person's voice than from most physical evidence." *Id.*

[6] "AI Voice Tech: What are the Privacy and Security Risks?," *Lexology* (June 21, 2023), *available at* https://www.lexology.com/library/detail.aspx?g=ad6dfe5c-a5e0-458a-bcff-63311942d8da.

identifier or biometric information." 740 ILCS 14/15(c).

21.     BIPA also requires that

[a] private entity in possession of biometric identifiers or biometric information must develop a written policy, made available to the public, establishing a retention schedule and guidelines for permanently destroying biometric identifiers and biometric information when the initial purpose for collecting or obtaining such identifiers or information has been satisfied or within 3 years of the individual's last interaction with the private entity, whichever occurs first.

740 ILCS 14/15(a).

22.     BIPA provides a private cause of action for any person aggrieved by a violation of the statute and allows recovery of $1,000 for negligent violations and $5,000 for intentional or reckless violations, as well as attorneys' fees and litigation expenses, and injunctive relief. 740 ILCS 14/20.

## II.     Defendants' Collection, Capture, Use, and/or Storage of Illinois Individuals' Biometric Identifiers and/or Biometric Information

23.     Recognizing that "[t]echnological innovation is vital to our brand and our long term success," Domino's has placed tremendous emphasis on exploring and investing in new technology initiatives in recent years.[7]

24.     To that end, Domino's was an early adopter of voice recognition technology for customer ordering. Domino's launched its first virtual ordering assistant powered by AI, called "DOM," in 2014, which began taking customer orders by telephone in 2018.[8]  When announcing

---

[7]  Domino's 2022 Annual Report on Form 10-K (Feb. 23, 2023), *available at* https://ir.dominos.com/static-files/077efb6a-962c-49f3-bd58-0be4a2bec18a., at 4, 9-10, 35, 41, 44; *see also*, *e.g.*, Domino's 2023 Investor Day Presentation, *available at* https://ir.dominos.com/static-files/4d1438ce-a87a-46f0-a491-ed48244517ee; "The Digital Innovations That Took Domino's from Pizza Place to Tech Titan" (Jan. 19, 2021), *available at* https://www.ncr.com/blogs/restaurants/digital-innovations-dominos.

[8]  Press Release, "Domino's on Quest for Digital Dominance Using Artificial Intelligence" (Apr. 23, 2018), *available at* https://ir.dominos.com/news-releases/news-release-details/dominos-quest-digital-dominance-using-artificial-intelligence-0.

the new technology, Dominos stated:

> "DOM was a key milestone not only for us, but for voice recognition technology in general," said J. Patrick Doyle, CEO and president of Domino's. "DOM was also the public face of our initial investment in artificial intelligence. Voice is a more natural way for people to interact with technology and that's why we have been investing in AI for more than half a decade." "We believe natural voice recognition is the future, as seen by the rise in virtual assistants, such as Amazon's Alexa and Google Home. More importantly, artificial intelligence provides great learning platforms that will enable us to do more to deliver convenience for our customers and better job experiences for our team members," Doyle added. "With DOM on the phones, our AnyWare ordering technology and plans we have for future in-store technology, our goal is to one day be 100 percent digital."[9]

25.     Domino's Standard Franchise Agreement, dated January 1, 2023 (the "Franchise Agreement")[10] contains a number of provisions governing franchisees' use of technologies and adoption of new technologies, as well as DPF and its affiliates' right to access data and information generated by those technologies:

26.     **Brand Technology**.

> You agree to use in the development and operation of the Store the management system and computer hardware and software and related technology designated by us, including without limitation, features such as high-speed broadband connectivity, high-speed broadband monitoring, online ordering, methods and means of encryption and access to our network resources, and other internet based technology and peripheral devices that we specify from time to time (the "Brand Technology"). . . . We may require that you enter into a license exclusively with us or our affiliates to use proprietary software developed by or for us. You may also be required to enter into agreements with others for use of third party software incorporated or used in connection with the Brand Technology. . . . We shall have independent access through monitoring programs or otherwise to data on your Brand Technology, including sales figures. There are no contractual limitations on our right or timing to access this information and data.

---

[9] *Id.*

[10] The Franchise Agreement is attached as Exhibit E to Domino's 2023 Franchise Disclosure Document ("FDD") (Apr. 1, 2023), *available at* https://www.franchimp.com/?page=pdf&f=107009_2023.pdf. The FDD is a disclosure document legally required by the Federal Trade Commission to be provided to prospective franchise purchasers. *See* 16 C.F.R. Parts 436 & 437.

\*\*\*

You acknowledge and agree that changes to technology are dynamic and not predictable within the term of this Agreement. In order to provide for inevitable but unpredictable changes to technological needs and opportunities, you agree that we shall have the right to establishing, in writing, reasonable new standards for the implementation of technology in the Domino's System; and you agree to abide by and fully adopt and implement those reasonable new standards established by us as if this Section 15.9.1 were periodically revised by it for that purpose.[11]

27. **Additional Order Processing Systems.**

We reserve the right to develop or contract with third parties to develop centralized or technology based methods of taking, processing, routing, and delivering orders in addition to the methods and technology we currently use or authorize (collectively "Additional Order Systems"). These may become mandatory at any time during the term of this Agreement … Regardless of the sources of funds to develop any Additional Ordering System we shall be the sole owner of all direct and related rights and assets, including software and hardware, intellectual property and all data generated by the Additional Ordering Systems…[12]

28. **Operating Manual**.

We will loan to you during the term of the franchise one or more copies of an operating manual or operational bulletins or similar materials containing mandatory and suggested specifications, standards and operating procedures and rules prescribed from time to time by us and information relative to your other obligations under this Agreement and the operation of the Store (the "Operating Manual"). We will provide you with a manual or electronic copy of the Operating Manual. The entire contents of the Operating Manual will remain confidential and are proprietary to us and our affiliates. We will have the right to add to and otherwise modify the Operating Manual from time to time, if deemed necessary to improve the standards of service or product quality or the efficient operation of the Store, to protect or maintain the goodwill associated with the Marks, to take advantage of advancements in technology, or to meet competition…. The provisions of the Operating Manual as modified from time to time, including the mandatory specifications, standards and operating procedures and rules prescribed from time to time by us and communicated to you in writing, will constitute

---

[11] Franchise Agreement § 15.9.1.

[12] Franchise Agreement § 15.9.4.

provisions of this Agreement as if contained in this Agreement.[13]

29.     Beginning in or about 2020, Domino's began using "voice AI" (sometimes referred to as "conversational AI") technology in various of its locations across the country, including in Illinois.[14]

30.     The voice AI technology used by Domino's was designed by Defendant ConverseNow, one of the leading voice AI technology platforms for restaurants.[15]

31.     As explained by ConverseNow,

> Voice AI, or conversational AI, is the newest generation of artificial intelligence for restaurants – a huge step up from the frustrating interactions we've all had in the past when talking to automated phone systems. Introduced to guests as virtual ordering assistants, voice AI engages in limitless conversations at once: each with the personable, tailored approach that people expect when speaking to a team member. Combining the ease and efficiency of online ordering with the customizable, high-touch experience of traditional drive-thru and phone conversations, voice AI automates the previously time-consuming order-taking process with remarkable accuracy. And with national and international QSR [quick service restaurant] brands racing to integrate conversational AI into their operation, voice AI is sweeping the restaurant industry.[16]

32.     The way ConverseNow's voice AI technology works is as follows: "Voice AI uses natural language processing (NLP), natural language understanding (NLU) and machine learning algorithms to interpret and respond to speech, and to learn from these user

---

[13] Franchise Agreement § 15.4.

[14] Kevin Damask, "AI Bots Help Bring Relief to Labor-Strapped QSRs," *QSRweb.com* (May 6, 2022), *available at* https://www.qsrweb.com/articles/ai-bots-help-bring-relief-to-labor-strapped-qsrs/.

[15] https://info.conversenow.ai/dfa-2.

[16] https://conversenow.ai/.

interactions."[17] This creates "a feedback loop where the voice AI platform continuously refines the underlying algorithms."[18] Moreover, "[p]rogress in voice AI capabilities not only allows accurate speech recognition and voice generation but also enables multilingual fluency and the implementation of custom voices. Casual consumers as well as business owners can tailor their selected voice AI platform to their preferred specificities."[19]

33.      Domino's has a proprietary POS system that all franchisees are required to install and use, called PULSE.[20] As explained by Domino's:

> Our Domino's PULSE system is designed to drive operating efficiencies for our franchisees and our corporate management and assist franchisees in independently managing their business. As of January 1, 2023, Domino's PULSE is being used in every Company-owned and franchised store in the U.S. . . . We believe utilizing Domino's PULSE with our integrated technology solutions throughout our system provides us with competitive advantages over other concepts. We intend to continue to enhance and grow our online ordering, digital marketing and technological capabilities.[21]

Pulse includes the following functions: "[p]izza order and tracking," "[c]ustomer database," and "[c]aller ID integration."[22]

34.      The Pulse Software License Agreement provides, in pertinent part:

> DPD, DPF (and their affiliates and successors and assigns) may, at any time, have

---

[17] "Conversational AI vs. Legacy Phone Systems: How Voice AI Prevails" (Oct. 5, 2022), *available at* https://conversenow.ai/resources/conversational-ai-vs-legacy-phone-systems/.

[18] *Id.*

[19] "The State of Restaurant Voice AI Technology 2022," *available at* https://conversenow.ai/resources/voice-ai/.

[20] Domino's 2022 Annual Report on Form 10-K (Feb. 23, 2023), *available at* https://ir.dominos.com/static-files/077efb6a-962c-49f3-bd58-0be4a2bec18a, at 9; FDD at 36-37.

[21] Domino's 2022 Annual Report on Form 10-K (Feb. 23, 2023), *available at* https://ir.dominos.com/static-files/077efb6a-962c-49f3-bd58-0be4a2bec18a, at 9.

[22] FDD at 36-37.

full access, both on-site and from a remote location, to all of License Holder's computer data, equipment and systems containing any and all of the information, records and reports required to be maintained by License Holder pursuant to its Franchise Agreement or License Agreement and to use the data in the evaluation of product and service, store performance, tests, EBITDA performance, and as an analytical tool to improve the operation of the Domino's system.[23]

35. ConverseNow's voice AI technology is touted as providing numerous benefits to restaurants. First, because it can handle "limitless" numbers of calls at the same time, there are "[n]o more missed orders because someone couldn't answer the phone or the customer hung up after hearing a busy signal."[24] This increases sales, "[b]oost[s] output with team members entirely focused on prep, fulfillment and in-person service, without having to stop and answer the phone every few minutes," and "captur[es] upsell opportunities that team members may forget about or feel too rushed to attempt."[25] Indeed, ConverseNow boasts that its voice AI technology is helping restaurants to achieve 31% same-store sales growth and a 17% average increase in tickets (due to upsell), and is providing up to 71 hours of additional labor per store each month.[26]

36. Conversenow's voice AI technology is also credited with "reduc[ing] employee turnover and improv[ing] employee retention by lightening the burden on team members who are stressed out from constant multitasking," "contribut[ing] to a satisfying customer experience through consistent, personalized guest service," and enabling restaurants "to cut costs while

---

[23] FDD Ex. J, Form Pulse License Agreement, at 5. The Pulse License Agreement is between Domino's franchisees and Domino's Pizza Distribution LLC ("DPD"). DPD "sells food products, ingredients, supplies and equipment, and licenses software to Domino's Pizza franchisees and company-owned stores located in the U.S." FDD at 2.

[24] https://conversenow.ai/technology/.

[25] *Id.*

[26] https://info.conversenow.ai/dfa-2.

simultaneously improving productivity and profits."[27]

37.     ConverseNow's voice AI technology is now being utilized at more than 120 Domino's locations across the United States.[28]

38.     This includes locations in Illinois. Based on the investigation of Plaintiffs' counsel, ConverseNow's voice AI technology is being used by at least 57 Domino's locations in Illinois.

39.     Raymond Montez, who owns 21 Domino's stores in Illinois and utilizes ConverseNow's voice AI technology in his stores, stated in a video testimonial that the technology has "increased our ticket price. It's driven the bottom line . . . And for our employee value proposition, we've actually had team members leave other franchises and come to use because we use the AI service."[29]

40.     Domino's Operations Manager Kevin Metzger has similarly credited ConverseNow's voice AI technology for not only alleviating pandemic-related labor shortages at his store, but actually creating business: "A phone being answered … usually took three minutes. So how many people or phones and lines do you need to get 70 orders in an hour? Whereas now, because of AI, we're getting those numbers, which used to be 40 or 50 now turned into 70 or 80 orders in an hour in our stores."[30]

41.     However, unbeknownst to Illinois customers, through the use of ConverseNow's

---

[27] "Why Voice AI is the Best Restaurant Management Strategy" (Jan. 26, 2023), *available at* https://conversenow.ai/resources/restaurant-management/.

[28] https://info.conversenow.ai/dfa-2.

[29] https://info.conversenow.ai/dfa-2; https://youtu.be/B4H_Ph1WGDs.

[27] "How Voice AI Makes Restaurant Ordering Systems More Efficient" (Aug. 11, 2022), *available at* https://conversenow.ai/resources/restaurant-ordering-system/.

voice AI technology, Defendants are collecting, capturing, otherwise obtaining, using, and/or storing customers' voiceprints, biometric identifiers, and/or biometric information in order to analyze, interpret, and/or use their speech signals; to help improve the accuracy and effectiveness of ConverseNow's voice AI technology;[31] to gather customer-specific data and/or identify specific customers; and to facilitate reordering and upselling.

42.     This is clear from ConverseNow's own descriptions of its voice AI technology:

> ConverseNow's "Voice AI uses natural language processing (NLP), natural language understanding (NLU) and machine learning algorithms to *interpret and respond to speech, and to learn from these user interactions*. This results in a feedback loop where the voice AI platform continuously refines the underlying algorithms. Put simply, voice AI makes every conversation better than the last."[32]

43.     "*By processing millions of conversations a month, AI learns at an exponential rate*, akin to a top team member absorbing the lessons learned by every other team member and manager in not just your stores, but all stores across your brand where AI operates."[33]   "[V]oice AI platforms use their *memories of past conversations* to recommend relevant order suggestions and upsells based on trends and guest order histories."[34]  Further, "voice AI assistants aren't merely executing simple, scripted actions. *Virtual assistants are dynamic conversationalists*

---

[31] Indeed, "ConverseNow has achieved a remarkable 22% increase in overall AI accuracy since last year." "ConverseNow's Voice AI Assistants Redefine the Restaurant Industry with Outstanding Milestones and Growth" (Dec. 8, 2023), *available at* https://hospitalitytech.com/news-briefs/2023-12-03?article=conversenows-voice-ai-assistants-redefine-restaurant-industry-outstanding-milestones-and-growth.

[32] "Conversational AI vs. Legacy Phone Systems: How Voice AI Prevails" (Oct. 5, 2022), *available at* https://conversenow.ai/resources/conversational-ai-vs-legacy-phone-systems/ (emphasis added).

[33] "AI vs. Call Center vs. Taking Orders In-Store" (Aug. 15, 2023), *available at* https://conversenow.ai/resources/ai-vs-call-center-vs-taking-orders-in-store/ (emphasis added).

[34] "A Guide to the Restaurant AI Installation and Training Process" (Dec. 21, 2022), *available at* https://conversenow.ai/resources/restaurant-ai/ (emphasis added).

*that recognize context clues, read between the lines and refine their algorithms with each order*. This means the ordering assistants *learn to recommend relevant order suggestions and upsells based on prior guest orders*."[35]

44.     In addition, one of voice AI's biggest advantages over other technologies is its ability, through the use of "advanced analytics," to "provide[ ] insights into guest behavior once limited to direct interactions with an individual or through a guest feedback survey."[36]  This is because "Voice AI uses machine learning to *instantly store insights on each transaction* and process massive amounts of data" and "can *analyze patterns and trends* in the moment and *provide personalized recommendations to guests*."[37] Voice AI also "*uses sentiment analysis* to extract valuable insights on previous customer interactions to *tailor suggested upsells based on the customer's previous orders, as well as based on learning from other conversations the AI has experienced across millions of other guest interactions*."[38]

45.     In September 2023, ConverseNow announced a rollout of its latest, augmented virtual ordering assistant, which incorporates generative AI[39] from Open AI's ChatGPT and Bard to train its model:

---

[35] "6 Franchise Trends that Restaurant Operators Need to Know" (Oct. 21, 2022), *available at* https://conversenow.ai/resources/franchise-trends/ (emphasis added).

[36] "AI is Reshaping the Most Profitable Fast Food Chains" (Sept. 1, 2022), *available at* https://conversenow.ai/resources/most-profitable-fast-food-chains/.

[37] *Id.* (emphasis added).

[38] "Why Restaurants Need Voice AI, Not Just Call Centers, to Keep up with Demand" (July 8, 2022), *available at* https://conversenow.ai/resources/voice-ai-vs-traditional-call-centers/ (emphasis added).

[39] In contrast to conversational AI, which "focuses on facilitating natural language conversations between humans and AI systems," generative AI "focuses on creating new and original content using machine learning algorithms." https://medium.com/@social_65128/differences-between-conversational-ai-and-generative-ai-e3adca2a8e9a.

"With our platform serving more than one million guests every month, ConverseNow has the unique advantage of ***possessing domain-specific and up-to-date proprietary data. The access to this data allows us to continuously augment and improve these proprietary LLMs [large language models]*** and deliver an even stronger guest experience, thereby creating an upward spiral of continuous improvement," Rahul Aggarwall, co-founder, COO and chief product officer, ConverseNow, said in the release.[40]

46.     ConverseNow's patents also indicate that its voice AI technology collects, captures, otherwise obtains, uses, and/or stores individuals' voiceprints, biometric identifiers, and/or biometric information. For example, one ConverseNow patent, Patent Number 11,348,160 (May 31, 2022), titled "Determining Order Preferences and Item Suggestions," states:

> The ordering system may utilize the ordered items in combination with various contextual cues to ***determine a customer identity which may then be linked to past orders and/or various order preferences***. Based on the ***determined customer identity***, the system may provide recommendations of additional order items or order alterations to the customer before ***personally identifying information (PII) has been collected from the customer***. The determination of the customer identity and the determination of recommendations may be performed by one or more machine learning algorithms that are trained on customer data, the retail store product listing, and associated data. ***The customer responses and past orders may be used to continually update the machine learning models and improve the quality of the customer experience***.[41]

47.     Another ConverseNow patent, Patent Number 2022/0277282 (Sept. 1, 2022), titled "Artificial Intelligence (AI) Order Taking System Enabling Agents to Make Corrections Via Point of Sale (POS) Devices," states:

> ***The data that is generated by each order, including the customer's utterances (e.g., audio)***, the text (*e.g.*, created based on a transcription of the customer's utterances), the software agent's modifications to the

---

[40]     "ConverseNow Intros AI Ordering" (Aug. 29, 2023), *available at* https://www.qsrweb.com/news/conversenow-intros-ai-ordering/ (emphasis added).

[41]     https://image-ppubs.uspto.gov/dirsearch-public/print/downloadPdf/11348160 (emphasis added).

contents of a cart based on the text, and the corrections made by the human agent to the text and to the contents of the cart ***are stored and used at a later date as training data to retrain one or more machine learning algorithms***. In this way, the automatic speech recognition (ASR) algorithm that converts speech (*e.g.*, the customer's utterances) to text and the software agent's modifications to the contents of the cart based on the text may be ***continually improved by the retraining to improve the accuracy of (i) the ASR algorithm and (ii) the AI-based software agent***.[42]

48.     ConverseNow's Patent Number 11,355,122 (Aug. 25, 2022), titled "Adaptively Modifying Dialog Output by an Artificial Intelligence Engine During a Conversation with a Customer," states:

> The systems and techniques described herein ***determine a type of customer based on the words the customer uses, the speed of the delivery of the words, the inflection and pitch of the words, one or more emotions conveyed by the words, other information, or any combination thereof***. The type of customer is used to determine a user model. The systems and techniques use the user model and a conversation state ***to adapt, in real-time, the dialog flow and recommendations***. By gaining a deeper understanding of the customer, the systems and techniques are able to improve the entire user experience when placing an order.[43]

49.     ConverseNow's Patent Number 11,355,122 (June 7, 2022), titled "Using Machine Learning to Correct the Output of an Automatic Speech Recognition System," states:

> The AI engine may determine (e.g., predict) recommendations that the software agent provides in the response as part of the conversation. For example, the recommendations may be based on items that the customer has previously ordered. . . To determine items that the customer previously ordered, ***the AI engine may determine an identity of the customer based on***, for example, ***an identifier*** (e.g., a phone number, an Internet protocol (IP) address, caller identifier, or the like) associated with the customer device, ***voice recognition***, facial recognition (*e.g.*, in the case of a video call), ***or another identifying characteristic***…[44]

---

[42]   https://image-ppubs.uspto.gov/dirsearch-public/print/downloadPdf/20220277282   (emphasis added).

[43]   https://image-ppubs.uspto.gov/dirsearch-public/print/downloadPdf/11355122   (emphasis added).

[44]   https://image-ppubs.uspto.gov/dirsearch-public/print/downloadPdf/11355122   (emphasis added).

50.     And ConverseNow's most recent patent, Patent Number 11,862,157 (Jan. 2, 2024), titled "Automated Ordering System," states:

> *The conversation data* that includes the verbal interaction between the employee and the customer when the customer is placing an order *is archived. The conversation data is used to train an AI engine* to provide a software agent (e.g., sometimes referred to as a 'chat bot').
>
> ***
>
> *To determine items that the customer previously ordered, the AI engine may determine an identity of the customer based on*, for example . . . *voice recognition* . . . ."[45]

51.     Upon information and belief, Defendants have not informed individuals in writing that their biometric identifiers or biometric information is being collected, captured, or otherwise obtained, nor have they informed customers of the purpose or length of time for which such information is being collected, stored, or used. 740 ILCS 14/15(b).

52.     Upon information and belief, Defendants have not received written releases executed by individuals whose biometric identifiers and/or biometric information is being collected, stored, or used.

53.     Upon information and belief, Defendants do not have publicly-available written policies regarding the retention or permanent destruction of the biometric identifiers or biometric information that they possess, "when the initial purpose for collecting or obtaining such identifiers or information has been satisfied or within 3 years of the individual's last interaction with the private entity, whichever occurs first," as required by BIPA. 740 ILCS 14/15(a). As such, it is likely that Defendants are retaining Plaintiffs and other similarly situated individuals'

---

[45]     https://image-ppubs.uspto.gov/dirsearch-public/print/downloadPdf/11862157     (emphasis added).

biometric identifiers and/or biometric information beyond the time limits set by BIPA.[46]

## III.   Plaintiffs' Experiences

### Plaintiff Odilon Garcia

54.     Over the course of the past five years, Mr. Garcia has called the Domino's location at 2337 West Cermak Road, Chicago, Illinois, dozens of times from his cellphone to place a pickup order for food. During the calls, Mr. Garcia interacted with a voice AI assistant who took his order and collected certain personal information from Mr. Garcia – specifically, his name and debit or credit card number for payment.

55.     Upon information or belief, the voice AI technology utilized for taking Mr. Garcia's orders collected, captured, used, and/or stored his unique voiceprint, biometric identifiers, and/or biometric information.

56.     At no time before or during the calls was Mr. Garcia ever informed (much less in writing), that his biometric identifiers or biometric information was being collected, captured, used, and/or stored by Defendants.

57.     Nor did Mr. Garcia ever provide a written release authorizing the collection, use, or storage of his biometric identifiers or biometric information.

### Plaintiff Jonathan Neumann

58.     Between May and July 2023, Mr. Neumann called the Domino's location at 1234 S. Canal St., Chicago, Illinois, on at least two occasions from his cellphone to place an order for

---

[46] Upon information and belief, DPF does not maintain its own website. There is no mention of a biometric data policy for customers on the Domino's corporate website. https://www.dominos.com/en/#!/content/privacy/ (last visited Oct. 3, 2024). By contrast, there is a "Biometric Data Policy" pertaining only to Domino's employees. https://www.dominos.com/en/#!/content/biometric-data-policy/ (last visited Oct. 3, 2024). Nor are any policies relating to biometric data or biometric information discussed on ConverseNow's website. https://conversenow.ai/privacy-policy/.

food delivery. During the calls, Mr. Neumann interacted with a voice AI assistant who took his order and collected certain personal information from Mr. Neumann – specifically, his name, address, and debit or credit card number for payment.

59.     Upon information or belief, the voice AI technology utilized for taking Mr. Neumann's orders collected, captured, used, and/or stored his unique voiceprint, biometric identifiers, and/or biometric information.

60.     At no time before or during the call(s) was Mr. Neumann ever informed (much less in writing), that his biometric identifiers or biometric information was being collected, captured, used, and/or stored by Defendants.

61.     Nor did Mr. Neumann ever provide a written release authorizing the collection, use, or storage of his biometric identifiers or biometric information.

<u>Plaintiff Zachery Young</u>

62.     Over the course of the past six months, Mr. Young has called the Domino's location at 2501 Broadway Street, Quincy, Illinois, approximately five to ten times from his cellphone to place orders for food.  During the calls, Mr. Young interacted with a voice AI assistant who took his order and collected certain personal information from him, depending on the type of order.  For those orders that were to be picked up at the store, the voice AI assistant would take Mr. Young's name, and for those orders that were to be delivered, the voice AI assistant would take Mr. Young's name, address, telephone number, and credit card information for payment.

63.     Upon information or belief, the voice AI technology utilized for taking Mr. Young's orders collected, captured, used, and/or stored his unique voiceprint, biometric identifiers, and/or biometric information.

64.     At no time before or during the calls was Mr. Young ever informed (much less in

writing), that his biometric identifiers or biometric information was being collected, captured, used, and/or stored by Defendants.

65.     Nor did Mr. Young ever provide a written release authorizing the collection, use, or storage of his biometric identifiers or biometric information.

## **CLASS ALLEGATIONS**

66.     **Class Definition**: Plaintiffs bring this action pursuant to Fed. R. Civ. P. 23(b)(3) on behalf of a class of similarly situated individuals, defined as follows (the "Class"):

> All individuals who had their voiceprints, biometric identifiers, and/or biometric information collected, captured, otherwise obtained, used, and/or stored by Defendants when making a telephone order at a Domino's location in the State of Illinois at any time within the applicable statute of limitations.

67.     Excluded from the Class are Defendants; Defendants' subsidiaries, parents, successors, predecessors, and any entity in which Defendants or their parents has a controlling interest (as well as current or former employees, officers and directors); Plaintiffs' counsel and Defendants' counsel; and the legal representatives, successors, and assigns of any such excluded persons.

68.     **Numerosity**: The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe there are many thousands of persons in the proposed Class.

69.     **Commonality and Predominance**:  Common questions of law and fact exist as to all members of the Class, which predominate over any questions affecting only individual members. Common questions of law and fact include:

a.   Whether Defendants collected, captured, or otherwise obtained biometric identifiers and/or biometric information from Plaintiffs and the Class;

21

b.  Whether Defendants stored Plaintiffs and the Class's biometric identifiers and/or biometric information;

c.  Whether Defendants used Plaintiffs and the Class's biometric identifiers and/or biometric information;

d.  Whether Defendants informed Plaintiffs and the Class in writing that their biometric identifiers and/or biometric information were being collected, stored, or used, and, if so, for what purpose and length of time;

e.  Whether Defendants obtained a written release executed by Plaintiffs and the Class before capturing, collecting, or otherwise obtaining their biometric identifiers and/or biometric information;

f.  Whether Defendants maintained a written policy, made available to the public, establishing a retention schedule and guidelines for permanently destroying biometric identifiers and/or biometric information;

g.  Whether Defendants retained Plaintiffs and the Class's biometric identifiers and/or biometric information beyond the time limits set by BIPA;

h.  Whether Defendants used Plaintiffs and the Class's biometric identifiers and/or biometric information to identify them;

i.  Whether ConverseNow profited from Plaintiffs and the Class's biometric identifiers and/or biometric information;

j.  Whether Defendants' conduct has violated BIPA;

k.  Whether Defendants' BIPA violations were committed intentionally, recklessly, or negligently; and

l.  Whether Plaintiffs and the Class are entitled to damages and injunctive relief.

70. **Typicality**: Plaintiffs' claims are typical of the claims of the members of the Class because the basis of Defendants' liability to Plaintiffs and the Class is substantially the same, and all members of the Class have suffered similar injuries as a result of the same practices alleged herein.

71. **Fair and Adequate Representation**: Plaintiffs will fairly and adequately represent the interests of the members of the Class and have no interests antagonistic to or in conflict with those of the Class. Plaintiffs' claims are typical of the claims of the members of the Class because the basis of Defendants' liability to Plaintiffs and the Class is substantially the same, and all members of the Class have suffered similar injuries as a result of the same practices alleged herein. Further, Plaintiffs have retained qualified counsel with substantial experience in prosecuting complex litigation and class actions nationwide.

72. **Superiority**: A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

### FIRST CAUSE OF ACTION
### Violation of the Illinois Biometric Information Privacy Act, 740 ILCS 14/15(a)
### (On behalf of Plaintiffs and the Class Against All Defendants)

73. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

74. Defendants are private entities under BIPA.

75. BIPA requires that "[a] private entity in possession of biometric identifiers or

biometric information must develop a written policy, made available to the public, establishing a retention schedule and guidelines for permanently destroying biometric identifiers and biometric information when the initial purpose for collecting or obtaining such identifiers or information has been satisfied or within 3 years of the individual's last interaction with the private entity, whichever occurs first." 740 ILCS 14/15(a).

76. Through their use of voice AI technology for telephone orders at Domino's locations in Illinois, Defendants possessed, and exercised control over, Plaintiffs and the other Class members' biometric identifiers and/or biometric information.

77. Upon information and belief, at all relevant times, Defendants have never had written, publicly available biometric identifier or biometric information retention or destruction policies in place, as required by BIPA. As such, it is likely that Defendants have not, and will not, destroy Plaintiffs and the Class's biometric identifiers and/or biometric information within the time limits set by BIPA.

78. Defendants' violations of BIPA, a statute that has been in effect since 2008, were intentional or in reckless disregard of the statutory requirements. Alternatively, Defendants negligently failed to comply with BIPA.

**SECOND CAUSE OF ACTION**
**Violation of the Illinois Biometric Information Privacy Act, 740 ILCS 14/15(b)**
**(On behalf of Plaintiffs and the Class Against All Defendants)**

79. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

80. Defendants are private entities under BIPA.

81. BIPA requires that before a private entity can collect, capture, or otherwise obtain an individual's biometrics, it must: (1) inform the person in writing that biometric identifiers or information will be collected or stored, (2) inform the person in writing of the specific purpose

and length of term for which such biometrics are being collected, stored, and used, and (3) obtain a written release from the person or their legally authorized representative authorizing the collection or his or her biometrics.  740 ILCS 14/15/(b).

82.    Defendants collected, captured, or otherwise obtained Plaintiffs and the other Class members' biometric identifiers and/or biometric information when they interacted with ConverseNow's voice AI technology while placing orders by telephone at Domino's locations in Illinois.

83.    Defendants failed to inform Plaintiffs and the other Class members in writing, in advance, that their biometric identifiers and/or biometric information was being collected or stored, as required by 740 ILCS 14/15(b)(1).

84.    Defendants failed to inform Plaintiffs and the other Class members in writing of the specific purpose and length of term for which their biometric identifiers and/or biometric information is being collected, stored, and used, as required by ILCS 14/15(b)(2).

85.    Defendants failed to obtain a written release from Plaintiffs, the other Class members, or their authorized representatives, as required by 740 ILCS 14/15(b)(3). As such, Plaintiffs and the other Class members' privacy rights and privacy interests in their biometric identifiers and/or biometric information have been violated.

86.    Defendants' violations of BIPA, a statute that has been in effect since 2008, were intentional or in reckless disregard of the statutory requirements. Alternatively, Defendants negligently failed to comply with BIPA.

**THIRD CAUSE OF ACTION**
**Violation of the Illinois Biometric Information Privacy Act, 740 ILCS 14/15(c)**
**(On behalf of Plaintiffs and the Class Against Defendant ConverseNow)**

87.    Plaintiffs repeat and reallege each and every allegation contained above as if fully

set forth herein.

88.   ConverseNow is a private entity under BIPA.

89.   BIPA provides that "no private entity in possession of a biometric identifier or biometric information may sell, lease, trade, or otherwise profit from a person's or a customer's biometric identifier or biometric information." 740 ILCS 14/15(c).

90.   Through its use of voice AI technology for telephone orders at Domino's locations in Illinois, ConverseNow possessed, and exercised control over, Plaintiffs and the other Class members' biometric identifiers and/or biometric information.

91.   ConverseNow profited from Plaintiffs and the other Class members' biometric identifiers and/or biometric information by, *inter alia*, using them to improve its voice AI technology, increase sales of the technology, and gain an edge over its competitors.

92.   As a result, Plaintiffs and the other Class members have been injured by ConverseNow's conduct, including through the unknowing loss of control of their unique biometric identifiers and/or biometric information and violation of their rights in, ownership of, and right to profit from, their unique biometric identifiers and/or biometric information.

93.   ConverseNow's violations of BIPA, a statute that has been in effect since 2008, were intentional or in reckless disregard of the statutory requirements. Alternatively, ConverseNow negligently failed to comply with BIPA.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, on behalf of themselves and the Class, respectfully requests that the Court enter an order as follows:

a.   Certifying the Class as defined above, appointing Plaintiffs as Class Representatives, and appointing the undersigned as Class Counsel;

b. Declaring that Defendants' actions, as set forth herein, violate BIPA;

c. Awarding injunctive and equitable relief as necessary to protect the interests of Plaintiffs and the Class by requiring Defendants to comply with BIPA;

d. Awarding statutory damages of $5,000 for each intentional and/or reckless violation of BIPA;

e. Awarding statutory damages of $1,000 for each negligent violation of BIPA;

f. Awarding Plaintiffs and the Class their reasonable litigation expenses and attorney's fees and costs;

g. Awarding Plaintiffs and the Class pre- and post-judgment interest, to the extent allowable; and

h. Awarding such other and further relief as the Court deems just and equitable.

## **JURY DEMAND**

Plaintiffs hereby demand a trial by jury of all claims that can be so tried.

Dated: October 9, 2024      Respectfully Submitted,

**KAHN SWICK & FOTI, LLC**

*/s/ J. Ryan Lopatka*
J. Ryan Lopatka (Bar Number 6303849)
161 N. Clark St., Suite 1700
Chicago, IL 60601
Telephone: (312) 759-9700
Facsimile: (504) 455-1498
Email: j.lopatka@ksfcounsel.com

Kim E. Miller
250 Park Avenue, 7th Floor
New York, NY 10177
Telephone: (212) 696-3732
Facsimile: (504) 455-1498
Email: kim.miller@ksfcounsel.com

Lewis S. Kahn
Melissa H. Harris
1100 Poydras Street, Suite 960
New Orleans, LA 70163
Telephone: (504) 455-1400
Facsimile: (504) 455-1498
Email: lewis.kahn@ksfcounsel.com
Email: melissa.harris@ksfcounsel.com

-and-

**DON BIVENS, PLLC**
Don Bivens
Teresita Mercado
15169 N. Scottsdale Road
Suite 205
Scottsdale, Arizona 85254
don@donbivens.com
teresita@donbivens.com
602-708-1450

*Counsel for Plaintiffs and the Putative Class*